[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 5, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14401

_____

D. C. Docket No. 06-02752-CV-WSD-1

CURTIS INVESTMENT COMPANY, LLC,

                                                    Plaintiff-Appellant,

versus

BAYERISCHE HYPO-UND VEREINSBANK, AG,
CHENERY ASSOCIATES, et al.,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 5, 2009)

Before BLACK and MARCUS, Circuit Judges, and BUCKLEW,[*] District Judge.

---

[*] Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

PER CURIAM:

Appellant Curtis Investment Company ("Curtis") brought this suit against eighteen defendants, including appellees Sidley Austin Brown & Wood; Raymond J. Ruble; Bayersiche Hypo-und Vereinsbank, AG and HVB U.S. Finance, Inc. (collectively "HVB"); LeBoeuf Lamb Greene & McRae, LLP; and Dominick DeGiorgio, alleging that Curtis detrimentally relied on a series of fraudulent misrepresentations that led Curtis to enter into a failed loan transaction. In particular, Curtis claimed violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO") and the Georgia Racketeer Influenced and Corrupt Organizations Act, Ga. Code Ann. § 16-14-1 et seq. ("Georgia RICO"), as well as common law fraud and a breach of an implied duty of good faith and fair dealing.

The district court dismissed Curtis's complaint in its entirety. Curtis now appeals only the dismissal of its Georgia RICO, common law fraud, and breach of the duty of good faith and fair dealing claims. After thorough review, we affirm the judgment of the district court.

I.

The factual and procedural history of this case are straightforward. In its amended complaint filed in the United States District Court for the Northern

2

District of Georgia, Curtis has alleged that it sought to shelter a $29 million capital gain from taxes and to reinvest the money beneficially through a loan-based tax shelter transaction created by the defendants and known as a Custom Adjustable Rate Debt Structure ("CARDS"). Curtis says that it entered into this transaction because the defendants continuously represented that the CARDS transaction would be a thirty-year loan at a favorable interest rate that would, among other things, offset Curtis's capital gain and provide tax-advantaged capital for reinvestment elsewhere. However, HVB, which held the CARDS loan, demanded full repayment of the loan after only one year and Curtis complied with that request. Curtis now says that it was injured by having to repay the loan after only a single year, because it had planned on amortizing the costs of the loan over a long-term period. Moreover, Curtis alleges, HVB's recall of the loan forced Curtis "to scramble" to find a last-minute replacement for its CARDS loan on terms less favorable than HVB's financing, (Am. Compl. ¶ 66), and, therefore, the Internal Revenue Service ("IRS") required Curtis to pay back taxes, interest, and penalties for the year 2000.

The gravamen of Curtis's amended complaint is that it was fraudulently induced by the defendants to enter into the CARDS transaction, because they knowingly misrepresented to Curtis that the transaction would be a long-term

3

arrangement when in truth and in fact the defendants intended that the arrangement would last only for a single year. Despite the fact that the Credit Agreement specifically reserved to HVB the right to demand repayment annually, Curtis also claimed the "Defendants persuaded [Curtis] that HVB would not demand prepayment of the [CARDS] Loan," and "repeatedly represented to [Curtis] that CARDS was a 30-year commercial financing transaction and that Defendant HVB had no intention of demanding prepayment." (Id. at ¶ 53). The amended complaint also avers that Curtis would not have entered into the transaction at all if it had known the loan would not be held by HVB for the entire thirty-year term.

The CARDS transaction unfolded in three steps. First, on December 14, 2000, Brondesbury Financial Services, LLC ("Brondesbury") received a loan from HVB that was subject to a lending agreement (the "Credit Agreement"). The Credit Agreement, among other things, explicitly authorized HVB, in its sole discretion, to demand repayment of the entire loan balance at the end of each year. Moreover, the Credit Agreement contained a merger clause expressly providing that the Credit Agreement embodied the "entire agreement between the parties," and a no-reliance clause that said the borrower did not rely upon the opinions of any other parties to the agreement or their advisors.

Then, Curtis purchased a portion of the loan collateral and assumed joint

4

liability for the balance of the loan through the execution of an Assumption Agreement on December 27, 2000. Under the terms of that agreement, Curtis expressly assumed all of the obligations of the Credit Agreement, promised to pay the annual interest on the loan, and agreed to pay the loan principal upon maturity. Finally, Curtis sold the loan collateral to a "tax neutral third party" and reported the entire value of the loan as its basis for the sale of the collateral, giving it a paper loss equal to the difference between the value of the loan and the value of the collateral that largely offset its $29 million capital gain.

On November 13, 2001, HVB exercised its right under the Credit Agreement to demand repayment of the entire loan on its first anniversary date. On December 14, 2001, Curtis repaid the loan in full.

Some time later in May 2005, the IRS disallowed the nearly $29 million short-term capital loss Curtis had claimed from the CARDS transaction, and assessed tax adjustments and penalties for incorrect and inadequate tax reporting. The IRS determined that Curtis had "no legitimate business purpose" for entering into the CARDS transaction, that the CARDS transaction was a fraudulent tax shelter scheme, and that all of the parties to the transaction, including Curtis, knew that the transaction was intended to be unwound after one year.

The government determined that the CARDS transactions and the

5

accompanying tax shelters were illegal, at least where, as here, the loan was unwound after only one year. The IRS said that unwinding the transaction after only one year was a part of a plan that was well-understood by all of the participants. Soon thereafter, HVB entered into a Deferred Prosecution Agreement (the "DPA") with the Justice Department. The DPA asserted that both HVB and the appellant knew that the CARDS transaction involved a loan issued to generate fraudulent tax benefits for Curtis that would become due in full after approximately one year.

The appellee-defendants moved to dismiss the amended complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Sidley Austin Brown & Wood ("Sidley") and LeBoeuf Lamb Greene & McRae, LLP ("LeBouef") also moved to dismiss the amended complaint, pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction.

The district court dismissed Curtis's amended complaint in its entirety. Curtis's federal RICO claim was dismissed, the trial court found, because it was barred by the merger doctrine, barred by the statute of limitations, and also because it failed to allege the predicate acts of fraud with sufficient particularity pursuant to Fed. R. Civ. P. 9(b). The district court also dismissed the Georgia RICO claim because it was barred by the merger doctrine and because the predicate acts of

6

fraud were not plead with the required particularity. The court went on to dismiss the common law fraud claim again because of the merger doctrine, because it was barred by the statute of limitations, and because it failed to allege the fraud with sufficient particularity. The claimed breach of an implied duty of good faith and fair dealing was dismissed because it was "not sustainable in the face of the Credit Agreement." Finally, the district court dismissed all of the claims leveled against LeBoeuf for a lack of personal jurisdiction.

This timely appeal ensued.

## II.

Curtis appeals only the dismissal of its Georgia RICO, common law fraud, and breach of an implied duty of good faith and fair dealing claims. We review each in turn under a de novo standard, Doe v. Pryor, 344 F.3d 1282, 1284 (11th Cir. 2003), "accept[ing] all well-pleaded factual allegations as true and constru[ing] the facts in the light most favorable to the plaintiff," Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003). Generally, to survive a motion to dismiss, a complaint "does not need detailed factual allegations," but it must provide the defendant with fair notice of what the claim is about and the grounds upon which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007). But, where the claim is grounded in fraud, such as Curtis's Georgia RICO and common law fraud

7

charges, the complaint must comply with Fed. R. Civ. P. 9(b)'s requirement that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

A.    Georgia RICO

To begin with, the district court properly dismissed the Georgia RICO claim, both because it was barred by the merger doctrine and because the predicate acts of mail and wire fraud were not plead with the particularity required by Rule 9(b). Under Georgia law, "[w]here a conflict exists between oral and written representations . . . if the parties have reduced their agreement to writing, all oral representations made antecedent to execution of the written contract are merged into and extinguished by the contract and are not binding upon the parties." First Data POS, Inc. v. Willis, 546 S.E.2d 781, 784 (Ga. 2001); see also Ainsworth v. Perreault, 563 S.E.2d 135, 139 (Ga. Ct. App. 2002) ("[R]ecent decisions of [the Georgia Court of Appeals] mandate that a merger or entire agreement clause bars purchasers from asserting reliance on the alleged misrepresentation not contained within the contract.") (quotation marks and citations omitted).[1]  Put differently:

---

[1] New York law, which governs the interpretation of the Credit and Assumption Agreements according to their terms, is similar.  See Gen. Bank v. Mark II Imports, Inc., 741 N.Y.S.2d 201, 202 (N.Y. App. Div. 2002) ("The guarantors' claim that they were fraudulently induced to enter into the subject lending relationship by plaintiff's promise to eliminate the 'borrowing cap' on advances to the borrower is, as a matter of law, foreclosed by an integration clause . . . ."); Coutts Bank (Switzerland) Ltd. v. Anatian, 691 N.Y.S.2d 409, 410 (N.Y. App. Div. 1999) (holding that reliance on alleged prior oral representations related to a loan agreement

> In written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud.

First Data POS, Inc., 546 S.E.2d at 784 (footnote and quotation marks omitted); see also Donchi, Inc. v. Robdol, LLC, 640 S.E.2d 719, 722 (Ga. Ct. App. 2007) ("In cases where the allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentation and his action for fraud must fail.") (quoting Authentic Architectural Millworks, Inc. v. SCM Group USA, Inc., 586 S.E.2d 726 (Ga. Ct. App. 2003)).  Quite simply, Curtis's Georgia RICO claim is barred by the merger clause found in the Credit Agreement.

First, the Credit Agreement contains a valid and unambiguous merger clause.  It states that "[t]his Agreement . . . contains the entire agreement between the parties with respect to the subject matter hereof and supercedes all oral statements and prior writings with respect hereto."[2]  (Credit Agreement § 10.19).

_____

is unreasonable where those prior representations conflict with the express provisions of the credit agreement and cannot support allegations of fraud in the inducement).

[2] Even though the Credit Agreement was not attached to the amended complaint, it was proper for the district court, and is proper for this Court to consider it because the agreement is a document to which Curtis referred in its amended complaint and it is integral to the claims presented.  See Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997).

The Credit Agreement also contains a no-reliance clause, which plainly says that the borrower did not enter into the contract based "upon any view expressed by any other party or other Credit Documents or any advisor to any such other party," and that the borrower "is a sophisticated and informed person that has a full understanding of all the terms, conditions and risks . . . ." (Credit Agreement § 5.17(b)-(c)).

There can be no dispute that Curtis became a party to the Credit Agreement when it entered into the Assumption Agreement, which expressly provided that Curtis will "comply with each of the covenants and agreements of the Borrower contained in the Credit Agreement on a joint and several basis with the Borrower as if the references therein to the Borrower were references to [it]." (Assumption Agreement ¶ 1). Thus, Curtis is bound by all of the terms of the Credit Agreement, including its merger clause. See Walls, Inc. v. Atl. Realty Co., 367 S.E.2d 278, 280 (Ga. Ct. App. 1988) ("As a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where . . . the provision to which reference is made has a reasonably clear and ascertainable meaning.") (citation and quotation marks omitted).

Second, the predicate acts upon which Curtis's Georgia RICO claim is grounded -- mail and wire fraud -- are based upon claimed misrepresentations

made about the longevity of the CARDS transaction before Curtis entered into the Assumption and Credit Agreements. Curtis argues that it signed the Assumption Agreement only after the appellee-defendants represented that the CARDS transaction was a long-term arrangement. But, the Credit Agreement explicitly gave HVB the right to demand repayment of the loan in full on each anniversary of the loan origination date, and contained a merger clause that explicitly said that its terms superseded and replaced any prior representations made to Curtis about the transaction. The district court properly concluded that the predicate acts underlying the Georgia RICO claim were barred by the merger doctrine.[3]

Finally, Curtis's suggestion that the merger clause cannot bar claims asserted against the appellee-defendants other than HVB because HVB was the only signatory to the Credit Agreement is unpersuasive. The Credit Agreement contains a no-reliance clause that states with clarity that Curtis did not rely "upon any view

---

[3] Curtis's suggestion that it can maintain a claim for fraudulent inducement even if the merger doctrine is implicated is unpersuasive. Georgia law is clear that "a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." Ainsworth, 563 S.E.2d at 137. Curtis has never alleged that it sought to rescind the Assumption or Credit Agreements. Indeed, it continued to engage in a CARDS-style transaction by making alternative financing arrangements after HVB called in the loan, and the amended complaint does not make a claim for rescission. Curtis has elected to affirm the agreements and seek damages. Where a plaintiff "elects to affirm a purchase agreement which contains a merger or entire agreement clause, he or she is precluded from recovering for the seller's alleged fraudulent inducement based on misrepresentations made outside the contract." Id. at 138 (quoting Herman Homes, Inc. v. Smith, 547 S.E.2d 591, 593 (Ga. Ct. App. 2001)).

expressed by any other party to this Agreement or any other Credit Documents <u>or</u> <u>any advisor</u> to any such other party," and that its decision was wholly based on its own professional judgment. (Credit Agreement § 5.17(b)) (emphasis added). Curtis contractually disclaimed any reliance on the appellee-defendants' statements. Moreover, the Credit Agreement's merger clause does not apply just to the parties to the contract. <u>Cf.</u> <u>First Data POS, Inc.</u>, 546 S.E.2d at 784 (stating that when a merger clause is in place "all prior negotiations, understandings, and agreements <u>on the same subject</u> are merged into the final contract, and are accordingly extinguished") (emphasis added). In short, Curtis's Georgia RICO claim is barred by the merger doctrine and was properly dismissed. <u>See</u> <u>id.</u> (holding that a merger clause forecloses RICO claims that are based upon allegedly fraudulent conduct).

Curtis's Georgia RICO claim also must be dismissed for a wholly independent reason -- because it was not plead with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. The particularity requirement for fraud applies to fraud-based state RICO claims, such as the instant one, brought in a federal court. <u>See</u> <u>Am. United Life Ins. Co. v. Martinez</u>, 480 F.3d 1043, 1064 (11th Cir. 2007); <u>Durham v. Bus. Mgmt. Assoc.</u>, 847 F.2d 1505, 1511-12 (11th Cir. 1988). Thus, under controlling law, Curtis's amended complaint must set

forth:

> (1) precisely what statements were made in what documents . . . , (2) the time and place of each such statement and the person responsible for making [them], and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997) (citations and quotation marks omitted). "Because fair notice is perhaps the most basic consideration underlying Rule 9(b), the plaintiff who pleads fraud must reasonably notify the defendants of their purported role in the scheme." Id. at 1381 (quotation marks, brackets, and citations omitted). "[I]n a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud." Id. (quotation marks omitted).

The problem here is that the amended complaint did not identify the time or place of the alleged fraudulent misrepresentations, nor did it aver who made the misrepresentations or to whom they were made. Instead, the amended complaint alleged only this much: "During either late November or early December, 2000, Defendants Hahn and Chenery Associates, Inc. transmitted a PowerPoint presentation to [Curtis] by interstate mail . . . [stating] that the CARDS transaction provided economic and other advantages," including Curtis's ability to "appl[y] the Loan proceeds to an investment/business with the reasonable expectation of

13

earning a greater return than the all-in cost of the Loan." (Id. at ¶¶ 42, 85(a)). And, in October 2000, Sidley forwarded a legal opinion stating "CARDS would 'more-likely-than not' provide the favorable tax treatment described by Hahn." (Id. at ¶¶ 44, 82(b)). Hahn and Sidley represented "[t]hrough oral and written materials" that the CARDS transaction would have a term and maturity date of thirty years. (Id. at ¶ 45(a)).

Hahn and Chenery Associates "represented that CARDS would provide [Curtis] with working capital for its investment business at a very favorable interest rate, such that [Curtis] could reasonably expect to generate a greater return than the all-in cost of the Loan." (Id. at ¶ 46). "HVB, Hahn, and Chenery Associates repeatedly represented to [Curtis] that CARDS was a 30-year commercial financing transaction and that Defendant HVB had no intention of demanding prepayment." (Id. at ¶ 53). "Defendants sold CARDS to [Curtis] by fraudulently promoting it as a 30-year financing transaction, knowing full well that no Defendant intended the financing to continue past the end of December 2001." (Id. at ¶ 73). "As a part of their conspiracy, each of the Defendants acted in concert with each of the other Defendants as part of a planned and prearranged common scheme to induce [Curtis] to pay millions of dollars in fees and charges in order for [Curtis] to participate in the CARDS transaction . . . ." (Id. at ¶¶ 88, 98).

14

And, finally, "Defendants conspired to represent that Defendant HVB had a present intent to provide the 30-year loan term financing on which the CARDS transaction was predicated and which was permitted by the CARDS transaction documents." (Id. at ¶ 105).

In that list of allegations, Curtis has not identified a single specific representation made by any appellee-defendant that HVB would not demand repayment of the loan in full after one year of the loan origination date, or that it would agree to maintain the life of the loan for thirty years notwithstanding the clear terms of the Credit Agreement to the contrary; nor has Curtis alleged the details of which individual appellee-defendant made what particular statement to whom, and when. Curtis's allegations are too vague and general to meet the requirements of Rule 9(b), and, therefore cannot support claims for a predicate act of mail or wire fraud. Curtis's amended complaint was properly dismissed by the district court.

B.     Common law fraud

The district court likewise properly dismissed Curtis's claim for common law fraud, because that claim was barred by the statute of limitations and by the merger doctrine. Nor was it plead with particularity. Under Georgia law, a four year statute of limitations applies to fraud claims. Ga. Code. Ann. § 9-3-31;

15

Shapiro v. S. Can Co., 365 S.E.2d 518, 519 (Ga. Ct. App. 1988) (statute of limitations for fraud with economic loss is the same as for the recovery of personal property). This limitations period begins to run at the time the plaintiff sustains actual damages from the fraud. Green v. White, 494 S.E.2d 681, 685 (Ga. Ct. App. 1997). Accordingly, the clock begins to tick at the time the first bit of injury arises; indeed "[t]he cause of action arises . . . before the client sustains all, or even the greater part, of the damages . . . ." Jankowski v. Taylor, Bishop & Lee, 273 S.E.2d 16, 17-18 (Ga. 1980).

In the absence of any Georgia law on the point, we turn for guidance to several of our sister Circuits that have found that the statute of limitations begins to run on an investment fraud claim, based on state law and arising from pre-contractual representations about the characteristics of that investment, when the plaintiff signs a contract that contains terms contrary to those representations. As the Fifth Circuit has explained:

> Courts recognize that financial investment involves attendant risks. The investor who seeks to blame his investment loss on fraud or misrepresentation must himself exercise due diligence to learn the nature of his investment and the associated risks. As several courts have recognized, the party claiming fraud and/or misrepresentation must exercise due diligence to discover the alleged fraud and cannot close his eyes and simply wait for facts supporting such a claim to come to his attention.

Martinez Tapia v. Chase Manhattan Bank, N.A., 149 F.3d 404, 409 (5th Cir. 1998).

16

Thus, the Fifth Circuit has concluded that the statute of limitations begins to run when the plaintiff receives and signs a contract that contains terms "so contrary to [the plaintiff's] alleged understanding of the deal that upon review of the document, [the plaintiff] would have been put on notice of [the defendant's] alleged fraud." McGill v. Goff, 17 F.3d 729, 733 (5th Cir. 1994), overruled on other grounds by Kansa Reinsurance Co. v. Congressional Mortg. Corp. Of Tx., 20 F.3d 1362 (5th Cir. 1994).

The Second Circuit, in a case where the plaintiff commenced a New York common law fraud claim against her financial advisor for misrepresenting that risky securities were good investments, similarly held that the statute of limitations began to run when the plaintiff received a prospectus for those securities before purchase that contained terms and warnings that "were sufficient to put a reasonable investor of ordinary intelligence on notice of . . . the risk, and the illiquidity of these investments." Dodds v. Cigna Sec. Inc., 12 F.3d 346, 351 (2d Cir. 1993); see also Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir. 1993) (finding a claim that a plaintiff was fraudulently induced through the promise of a legitimate tax shelter to purchase commercial property was time-barred, because the document marketing the investment "contained a host of prior warnings making it plain that [the plaintiff] was purchasing, to put it mildly, a

17

highly speculative investment").

The statute of limitations began to run in this case on December 27, 2000, when Curtis signed the Assumption Agreement, and thus assumed the terms and obligations of the Credit Agreement, including the explicit provision allowing HVB to demand repayment of the entire loan after a single year -- a term that Curtis itself alleges is wholly inconsistent with the appellee-defendants' prior representations and its understanding of the deal. The statute of limitations expired on December 27, 2004; Curtis did not file its claims, however, until November 9, 2006.

Indeed, at the very latest, the statute of limitations must have begun to run nearly five years before Curtis filed its suit on December 14, 2001, the date when Curtis was required to repay the CARDS loan in its entirety. As the district court noted, once Curtis was notified by HVB that it was demanding repayment of the loan in full after only one year, the difference between the alleged representations made by defendants and the terms of the Credit Agreement could not have been more explicit, and any reasonable party would have been prompted to investigate both the possibility of fraud and conspiracy.

Therefore, Curtis's fraud claim could survive only if the statute of limitations was somehow tolled. Under Georgia law, the statute of limitations on a

18

fraud claim may be tolled only if the defendant conceals the fraud in a way that "debars or deters" the plaintiff from filing suit. Ga. Code Ann. § 9-3-96. Where, as here, actual fraud is the gravamen of the cause of action, the statute of limitations period is tolled "until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." Hunter, Maclean, Exley & Dunn, P.C. v. Frame, 507 S.E.2d 411, 413 (Ga. 1998) (quoting Shipman v. Horizon Corp., 267 S.E.2d 244, 246 (Ga. 1980)). As the district court observed, however, Curtis did not plead facts sufficient to show that the appellee-defendants "debarred" or "deterred" it from discovering the fraud.

On December 14, 2001, when HVB demanded and received full repayment of the loan from Curtis, Curtis unmistakably knew that HVB would maintain the CARDS loan for only one year. Plainly, Curtis then knew that any purported representations the appellee-defendants had made about the long-term nature of the transaction were false. That claimed misrepresentation is at the core of Curtis's complaint and there is no suggestion that the appellee-defendants did anything to prevent Curtis from investigating and discovering the facts supporting the fraud claim at that time.

Curtis argues, however, that it could not have brought its suit earlier because: (1) the IRS did not begin pursuing Curtis for unpaid taxes until 2005; (2)

19

HVB did not enter into the DPA until 2006; and (3) HVB allegedly told Curtis that it was demanding repayment because of the events of September 11, 2001. But, none of this changes Curtis's actual knowledge on December 14, 2001 that HVB had demanded full repayment of the loan after only one year. Nor does it change Curtis's actual knowledge on the date it signed the Credit Agreement that the contract contained terms utterly contrary to the alleged earlier representations. That the IRS did not prosecute the impropriety of Curtis's $29 million CARDS-based capital loss deduction until 2005 does not in any way obviate Curtis's knowledge of the basic facts. Similarly, HVB's DPA (which also said, in its statement of fact, that "all parties involved, including the clients/'borrowers,' knew that the transactions would be unwound in approximately one year in order to generate the phony tax benefits sought by the client participants") and HVB's explanation for the repayment demand do not alter Curtis's understanding in December 2001 that the CARDS transaction would not be long-term.

Moreover, Curtis's common law fraud claim is also barred by the merger doctrine. As we have already explained, Georgia law is clear that when a party "affirms a contract which contains a merger or disclaimer provision and retains the [benefit of the contract], [it] is estopped from asserting that [it] relied upon the seller's misrepresentation," and its "action for fraud must fail." <u>Markowitz v.</u>

20

Weiland, 532 S.E.2d 705, 708 (Ga. Ct. App. 2000); Estate of Sam Farkas, Inc. v. Clark, 517 S.E.2d 826, 828-29 (Ga. Ct. App. 1999).

Finally, and independently, as we have already detailed, Curtis's allegations of fraud -- which formed the basis for the mail and wire fraud allegations underlying the Georgia RICO claim and for the common law fraud claim -- were not plead with the particularity required by Rule 9(b). In short, the district court properly dismissed the common law fraud charge too.

C.    Implied duty of good faith and fair dealing

As for the last of the claims, it is undisputed that the Credit Agreement, by its express terms, is governed by New York law. Under New York law, "[i]t is well settled that in every contract there exists an implied covenant of good faith and fair dealing." Outback/Empire I, LP v. Kamitis, Inc., 825 N.Y.S.2d 747, 747 (N.Y. App. Div. 2006) (quotation marks and citation omitted). This obligation arises even if the express terms of the contract have not been breached where one party has effectively deprived the other of the bargained for benefits of the contract. See Greenwich Village Assoc. v. Salle, 493 N.Y.S.2d 461, 464 (N.Y. App. Div. 1985); see also Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is

21

merely a breach of the underlying contract.") (quotation marks and citation omitted).

But, the covenant of good faith and fair dealing will be implied only where it would be "consistent with other mutually agreed upon terms in the contract." Sabetary v. Sterling Drug, Inc., 69 N.Y.2d 329, 335 (N.Y. 1987); Chrysler Credit Corp. v. Dioguardi Jeep Eagle, Inc., 596 N.Y.S.2d 230, 231 (N.Y. App. Div. 1993) ("Although an obligation of good faith and fair dealing is implied in every contract, that obligation may not be implied when it would be inconsistent with other terms of the contract between the parties.") (citation omitted). The covenant "is breached only when one party seeks to prevent the contract's performance or to withhold its benefits." Met. Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989); Collard v. Incorporated Village of Flower Hill, 427 N.Y.S.2d 301, 302 (N.Y. App. Div. 1980). Thus, under New York law, "[a] financing institution does not act in bad faith when it exercises its contractual right to terminate financing." Chrysler Credit Corp., 596 N.Y.S.2d at 232.

Here, there has been no breach of the parties' bargained-for contractual rights. HVB acted in a manner wholly consistent with the express rights it was granted by Curtis; again, the Credit Agreement is clear that HVB had the unilateral right to demand repayment of the loan in full on an annual basis. Indeed, Curtis

22

has made no argument that HVB exercised its contractual right arbitrarily or irrationally. Instead, it has only claimed that HVB could not exercise this contractual right for thirty years without violating an implied duty of good faith and fair dealing. The theory is untenable, because imposing an implied covenant of good faith and fair dealing in this way would permit Curtis to add wholly new and unbargained for advantageous terms to its contract that are at war with the express terms of the agreement. Put differently, the implied covenant of good faith and fair dealing would not fulfill the express terms of the Credit Agreement, nor would it give any meaning to an ambiguous term. Accordingly, the district court properly dismissed this claim as well.

**AFFIRMED.**