**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN C. REZNER, an individual,
       *Plaintiff-Appellee,*

v.

BAYERISCHE HYPO-UND
VEREINSBANK AG, a corporation;
HVB U.S. FINANCE, INC.,
       *Defendants-Appellants,*

and

HVB AMERICA, INC.; HVB CAPITAL
MARKET, INC.; HVB RISK
MANAGEMENT PRODUCTS, INC.,
       *Defendants.*

No. 09-16402

D.C. No.
5:06-cv-02064-JW

OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
November 3, 2010—San Francisco, California

Filed December 28, 2010

Before: Arthur L. Alarcón and Pamela Ann Rymer,
Circuit Judges, and David G. Trager,
Senior District Judge.*

Opinion by Judge Alarcón

*The Honorable David G. Trager, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

20699

## COUNSEL

Jerome B. Falk, Jr. (argued), Dennis T. Rice and Sara J. Eisenberg, Howard Rice Nemerovski Canady Falk & Rabkin, San Francisco, California, and William M. Lukens, Jenifer L. Jonak and Louis H. Pugh, Lukens Law Group, San Francisco, California, for the plaintiff-appellee.

Thomas H. Dupree (argued) and Amir C. Tayrani, Gibson Dunn & Crutcher LLP, Washington, D.C., Orin Snyder, Gibson Dunn & Crutcher LLP, New York, New York, and Mark P. Ressler, Ronald R. Rossi and Michael Hanin, Kasowitz Benson Torres & Friedman LLP, New York, New York, for the defendants-appellants.

## OPINION

ALARCÓN, Circuit Judge:

John C. Rezner filed this action against Bayerische Hypo-Und Vereinsbank AG d/b/a HVB Group and HVB Structured Finance, Inc. (collectively "HVB") for violation of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), codified at 18 U.S.C. §§ 1961 *et seq.*, and the Unfair Business Practices Act of California ("UCL"), codified at Cal. Bus. & Prof. Code §§ 17200 *et seq*. Rezner alleges that HVB engaged in a scheme to defraud the United States of tax revenue through fraudulent tax shelters that caused injury to purchasers of such shelters.

We must decide whether Rezner has shown under RICO's proximate causation requirement that HVB's fraud against the United States caused injury to his business or property. HVB contends that Rezner's RICO claim was barred by the Private Securities Litigation Reform Act ("PSLRA"), codified in relevant part at 18 U.S.C. § 1964(c). HVB also argues that the district court erred in granting summary judgment on its UCL claim because the circumstantial evidence it presented demonstrates that a reasonable jury could find that Rezner was a co-conspirator in the tax shelter scheme.

We reject HVB's argument that Rezner's RICO claim is barred by the PSLRA. We reverse the district court's order granting summary judgment as to Rezner's RICO and UCL

claims, however, because we are persuaded that the district court erred in concluding that Rezner had satisfied the proximate causation requirement for a civil RICO claim.

I

A

It is undisputed that John Rezner participated in a financial transaction called Custom Adjustable Rate Debt Structure ("CARDS"), designed to avoid the payment of federal income taxes. CARDS was introduced to him by Marc Harper, a financial advisor with myCFO, Inc. CARDS loan transactions are designed to generate the appearance of large capital losses for high net worth investors to reduce their tax income liability.

In 2001, to carry out this CARDS scheme, HVB incorporated Pinner Financial Trading, LLC ("Pinner"), in the state of Delaware. HVB entered into a credit agreement with Pinner pursuant to which it loaned Pinner Euros 48,000,000 ("the Pinner loan"). Pinner converted the proceeds of the loan into an interest-bearing certificate of deposit for 85% of the loan, and a Euro-denominated promissory note in the amount of Euros 8,000,000 (or approximately $7,300,000) for the remaining 15%. These were placed in an account with HVB to serve as collateral for the Pinner loan.

Rezner assumed Pinner's obligation to pay HVB for the loan of Euros 48,000,000 in exchange for Rezner taking ownership of the Euro-denominated promissory note that was part of the collateral for the Pinner loan. To gain the right to use Pinner's promissory note, Rezner pledged, as collateral for the Pinner loan, a security interest in a SolomonSmithBarney account that held approximately $11,000,000 in municipal bonds. Rezner then sold his interest in Pinner's promissory note to a third party at its fair market value.

The legality of the tax consequences of this CARDS facility was supported by a legal opinion letter from Sidley Austin Brown & Wood LLP ("Sidley Austin"). Both Sidley Austin and LeBoeuf Lamb Greene & MacRae LLP ("LeBoeuf") advised Rezner that the loan on which he was co-obligor with Pinner was a for a 30-year term, but had to be renewed or terminated upon each anniversary by the parties. Upon each renewal, HVB had the sole discretion to increase the interest rate and fees associated with the loan.

Another investment firm called Chenery Associates, who engineered CARDS facilities, was involved in negotiating Rezner's participation in the transactions. Rezner paid a total of over $4,000,000 in fees to participate in the CARDS transactions: $1,692,829 to HVB; $1,320,000 to myCFO; $250,000 to Sidley Austin; $80,000 to LeBoeuf; and $800,000 to Chenery.

On March 18, 2002, the IRS published a notice announcing that they would not allow taxpayers to claim a loss based on transactions structured similarly to CARDS. Rezner subsequently claimed a capital loss of $39,649,866 on his 2001 tax return based upon the fact that he received only $7,300,000 for the sale of the Euro-denominated promissory note, while assuming joint and several liability for the full Euros 48,000,000 Pinner loan. Rezner carried most of the loss to the year 2002, when he sold over $30,000,000 in Yahoo! stock. He claimed no tax liability for that year in part because of the alleged carry-over loss resulting from assuming liability for the Pinner loan.

In August 2002, one year after Rezner entered into his agreement to assume liability for the Pinner loan, HVB raised the fees and interest rate on the loan. It was entitled to do so under its agreement with Pinner. Rezner accepted the increase. On August 13, 2003, HVB unilaterally terminated the loan and demanded immediate repayment of the entire outstanding balance.

In 2005, Rezner was audited by the IRS. The audit resulted in the denial of Rezner's claimed capital loss made in connection with the Pinner loan. He was also ordered to pay approximately $11,000,000 in back taxes and interest.

## B

On February 13, 2006, HVB admitted to participating in a number of unlawful tax shelter schemes, including the Pinner loan, that were designed to defraud the United States. HVB entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney for the Southern District of New York.[1] HVB stated in the DPA that "all parties involved [in the illegal tax shelter transactions], including the clients/'borrowers,' knew that the transactions would be unwound in approximately one year in order to generate the phony tax benefits sought by the client participants." (DPA, Statement of Undisputed Facts at ¶ 19, *Rezner*, No. 06-02064 (N.D. Cal. Feb. 3, 2009), ECF No. 160, Ex. B.)

## II

## A

On March 17, 2006, Rezner filed a complaint in the United States District Court for the Northern District of California against HVB, Domenick DeGiorgio, a former HVB employee who orchestrated the illegal tax shelters, Skyline Advisory Services, a financial advisory service which provided ongoing tax audit assistance to former HVB CARDS clients and liaised with the IRS, and Randall Bickham, a founder and director of Skyline.[2]

---

[1]In the DPA, HVB agreed to pay heavy fines, limit its banking practices, and to cooperate with the federal investigations into these illegal tax shelters. In return for its cooperation, HVB might avoid prosecution.

[2]Rezner stipulated to the dismissal of DeGiorgio, Bickham, and Skyline.

In its answer, HVB admitted that it participated in the CARDS transactions. It denied the other allegations. It asserted fifteen affirmative defenses. On May 29, 2007, Rezner filed a second amended complaint. The amended complaint asserted three causes of action against HVB: 1) RICO violations; 2) fraud; and, 3) violations of the California UCL.

B

On December 19, 2007, HVB filed a motion for summary judgment on the ground that Rezner's action was preempted by section 107 of the PSLRA. HVB argued that because Rezner pledged municipal bonds as part of the substitute collateral for the Pinner loan, Rezner's claim against HVB must be brought as a securities fraud claim under section 10(b) of the Securities Exchange Act, not under RICO. In its August 13, 2008 order, the district court denied HVB's motion. It held that:

> [p]laintiff's voluntary and discretionary decision to include bonds in the Substitute Accounts was not "in connection with" the alleged fraud. Therefore, Defendants' alleged conduct is not actionable as securities fraud. Since the alleged conduct is not actionable as securities fraud, it is not barred by the PSLRA and may form the basis of Plaintiff's RICO claim.

C

Rezner filed a motion for partial summary judgment on February 3, 2009. He argued that HVB's admission that it defrauded the United States in the DPA was sufficient to establish that HVB violated RICO and the UCL. In his motion, Rezner also contended that as to five of HVB's affirmative defenses, "the pleadings, admissions, and discovery in this case establish that there is no evidence to support these defenses and that these defenses are unavailable as a matter

of law." In opposition to Rezner's motion, HVB argued that Rezner had failed to satisfy RICO's proximate causation requirement because Rezner's own actions caused his alleged injury. HVB asserted that this was a dispute regarding a genuine issue of material fact that precluded summary judgment.

The district court granted summary judgment in favor of Rezner on his RICO and UCL claims. It held that the undisputed evidence demonstrated that HVB had violated RICO and the UCL. The court also concluded that HVB's affirmative defenses were "unsupported by evidence." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, No. C 06-02064, 2009 U.S. Dist. LEXIS 129189, at *48 (N.D. Cal. May 1, 2009). The district court rejected HVB's primary reliance on the report of its expert, Alan Dlugash ("the Dlugash Report"), to show that Rezner was aware that the CARDS transactions lacked economic substance. The district court stated that there was "nothing in the Dlugash report that suggest[ed], based on admissible evidence, that [Rezner] was aware that the CARDS facility was an unlawful tax shelter." *Id.* at *28. Accordingly, the district court held that HVB had failed to demonstrate that there was a genuine issue of material fact in dispute on Rezner's RICO and UCL claims.

The district court accepted the parties' stipulation to dismiss Rezner's cause of action for fraud. On June 16, 2009, the district court entered a final judgment against HVB. HVB has timely appealed. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III

HVB contends that the district court erred in determining that Rezner's RICO claim was not barred by the PSLRA, and that Rezner had established that HVB's fraud against the United States caused his injury. We review the district court's summary judgment *de novo*. *Te-Moak Tribe of W. Shoshone*

*of Nev. v. United States Dep't of Interior*, 608 F.3d 592, 596 n.3, 598 (9th Cir. 2010). When reviewing a district court's summary judgment decision, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* Where material factual disputes exist, the court must allow a jury to resolve them. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).

## A

HVB contends that Rezner's RICO claim was preempted by the PSLRA because "his pledge of municipal bonds [as substitute collateral for the CARDS loan] . . . qualified as the sale of securities under settled precedent" which constituted "a fraud coincid[ing] with the sale of securities" as described in *SEC v. Zandford*, 535 U.S. 813, 815 (2002). (Appellant's Op. Br. 48.)

**[1]** The PSLRA amended RICO to state

> Any person injured in his business or property by reason of a violation of [RICO] may sue therefor in any appropriate United States district court . . . , except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].

18 U.S.C. § 1964(c). Actions for fraud in the purchase or sale of securities are controlled by section 10b of the Securities Exchange Act of 1934. *See Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981) ("When there is a sale of a security and fraud 'touches'

the sale, there is redress under section 10(b).") (citation omitted). Section 10b provides as follows:

It shall be unlawful for any person . . .

To use or employ, *in connection with the purchase or sale* of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (emphasis added).

**[2]** The requirement under section 10(b) that the fraud committed be "in connection with" a securities transaction means "that a certain relationship [must] be established between the fraud and the transaction that resulted in the injury complained of." *In re Fin. Corp. of Am. S'holder Litig.* ("*Financial Corp.*"), 796 F.2d 1126, 1129-30 (9th Cir. 1986). Where the alleged fraudulent misrepresentations are not made "in connection with" the purchase of securities, the conduct is not actionable under section 10(b) because "the alleged fraud upon the shareholders of the corporation [is] not of the type the securities laws were intended to remedy." *Id*. at 1129.

**[3]** While a pledge of securities can effect a transfer of "an interest in a security" sufficient to qualify as a "sale" of a security under the Securities Act, *Rubin v. United States*, 449 U.S. 424, 429 (1981), " 'it is not sufficient [merely] to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.' " *Financial Corp.*, 796 F.2d at 1130 (quoting *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) *cert. denied*, 469 U.S. 884 (1984)).

*Financial Corp.* concerned advice from Arthur Andersen to the plaintiff about how to account for the purchase and sale

of various securities. The plaintiff alleged that Andersen's fraudulent accounting advice in connection with the securities caused its loss. We held that the plaintiff had failed to satisfy the "in connection with" requirement because its loss resulted from Arthur Andersen's advice, not the sale of the securities. *Id.* at 1130-31; *see also Chemical Bank*, 726 F.2d at 944 & n.24 (holding that a loan procured by fraud that happens to be "collateralized by a pledge of security as to which no misrepresentations were made" does not come within section 10(b) if "but for the pledge it would not").

**[4]** The connection here between the pledge of securities and the fraud is even more tenuous. There is no allegation that there were any misrepresentations about the value of the securities Rezner pledged. While the CARDS scheme, as implemented in this case, involved the pledge of some municipal bonds, Rezner's alleged loss was not a result of the pledge of these bonds. Rezner's alleged loss resulted from HVB's misrepresentations to the United States regarding the tax treatment of the Pinner loan. In *Financial Corp.*, at least the fraudulent advice directly related to the securities; here, the securities were merely a happenstance cog in the scheme. The fraud bore an insufficient connection to the securities.

HVB argues that *Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007), and *Curtis Inv. Co. v. Bayerische Hypo-und Vereinsbank*, No. 06-cv-2752, 2007 WL 4564133 (N.D. Ga. Dec. 20, 2007), *aff'd*, 341 Fed. Appx. 487 (11th Cir. 2009), suggest otherwise. We disagree.

In *Swartz*, the fraud involved a tax-shelter scheme named BLIPS. The various transactions, called BLIPS, had the effect "to artificially inflate Swartz's basis in the Microsoft stock so he could sell it and claim a capital 'loss' in the amount of the difference between the inflated basis and the value of the stock." *Swartz*, 476 F.3d at 759. The sale of the Microsoft stock was the "lynchpin of the BLIPS scheme" and the fraud and security were directly connected. *Id.* at 761. Here, the

bonds were not the lynchpin of the scheme. Rezner's decision to use bonds had no effect on the fraudulent scheme, which instead concerned the tax treatment of a loan. *See Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999) ("[T]he fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves.").

In *Curtis*, which involved similar RICO claims by a different plaintiff against HVB for its sale of the CARDS facility, the district court, in an unpublished opinion, noted in dicta in one sentence that "[i]f the collateral was a promissory note, that note was likely a 'security' within the scope of the PSLRA." *Curtis*, 2007 WL 4564133, at *11. It did not conduct any further analysis. Without something further, *Curtis* is not persuasive authority for holding that the PSLRA bars Rezner's RICO claim here.

**[5]** The district court did not err in determining that the PSLRA does not apply in this matter.

### B

HVB argues that the district court erred in granting summary judgment in favor of Rezner because Rezner has failed to establish that HVB's fraud against the United States caused his injury.

**[6]** To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).[3]

---

[3]18 U.S.C. § 1962(c) provides

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To have standing under civil RICO, Rezner is required to show that the racketeering activity was both a but-for cause and a proximate cause of his injury. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Proximate causation for RICO purposes requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Rezner argues that HVB's defrauding of the United States through the CARDS facility caused his injury. There is no dispute that HVB defrauded the United States through CARDS. We hold, however, that HVB's fraudulent activity towards the United States did not cause Rezner's injury.

In *Hemi Group, LLC v. City of New York, N.Y.*, 130 S. Ct. 983, 987 (2010), New York City, seeking recovery of lost tax revenue, had sued a New Mexico business that sold cigarettes. The City alleged that the business's failure to file customer lists with the State of New York constituted mail fraud. *Id.* The Supreme Court held the City could not show proximate causation because the business's fraudulent conduct was directed at a third-party, the State of New York. *Id.* at 988-89. The City was only indirectly injured as a result. *Id.* at 989.

Similarly, in *Anza v. Ideal Steel*, 547 U.S. 451, 457 (2006), the Court held that a plaintiff could not prove a RICO violation against a business competitor based on that competitor's fraud against the State of New York. The plaintiff could not show proximate causation because "[i]t was the State that was being defrauded and the State that lost tax revenue as a result." *Id.* at 458. The Court acknowledged that the plaintiff suffered harm when the competitor did not charge customers sales tax, but noted that "[t]he cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.*

[7] Here, Rezner alleges that a third-party, the United States, was directly injured by HVB's fraudulent activity. It

was the United States that lost tax revenue as a direct result of HVB's fraud. Rezner's asserted injury only indirectly resulted from HVB's fraudulent activity against the United States. *See Holmes*, 503 U.S. at 271 (holding that where a fraudulent scheme directly harmed stockbrokers by causing stock prices to plummet, creditors to the stockbrokers could not show proximate causation because their injury was "purely contingent" on the harm to the brokers).

**[8]** In analyzing proximate causation, one consideration is whether a better suited plaintiff would have an incentive to sue. *See Hemi*, 130 S. Ct. at 990. Here, the direct victim of HVB's fraudulent conduct—the United States—did in fact sue by entering into a deferred prosecution agreement with HVB. The United States, not Rezner, was best situated to recover for fraud against it.

Rezner argues this case is more like *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008), in which the Supreme Court held a plaintiff need not show reliance to make out a claim for mail fraud under RICO. *Bridge* involved competing bidders at a county tax-lien auction in which multiple bidders offered the lowest bids. To decide which bidder would be awarded the lien, the county allocated liens on a rotational basis. Because bidders had an incentive to send agents to bid on their behalf to obtain a disproportionate share of liens, the county prohibited bidders from using such agents. *Id.* at 642-43. A losing bidder alleged that a competitor had defrauded the county by employing shadow bidders to secure a greater proportion of liens than it was due. *Id.* at 643-44. The Court held that the losing bidder could meet RICO's causation requirement, even though the fraud was perpetrated against a third-party, the county. *Id.* at 661.

**[9]** The Court distinguished *Anza*, because in *Bridge* the losing bidders "were the *only* parties injured by petitioners' misrepresentations." *Id.* at 658. The county was not; it received the same revenue regardless of which bidder pre-

vailed. *Id.* at 642. The Court noted that no more immediate victim than the losing bidder was better situated to sue. *Id.* at 658. Here, the United States, not Rezner, was the immediate victim of HVB's fraud and better situated to sue HVB. Therefore, we hold that Rezner cannot show proximate causation based on HVB's fraud against the United States and REVERSE the district's court grant of summary judgment on the RICO claim.

IV

HVB asserts that the district court erred in granting Rezner's motion for partial summary judgment on his UCL claim. We agree.

The district court granted Rezner's motion for partial summary judgment on his UCL claim based upon its conclusion that HVB "violated the federal RICO statute through its implementation of the CARDS scheme." *Rezner*, 2009 U.S. Dist. LEXIS 129189, at *45. The district court reasoned that HVB's violation of RICO was sufficient to establish a violation of "the unlawfulness prong of California's UCL." *Id.*

**[10]** Because we hold that Rezner has not shown a violation of RICO due to the lack of proximate causation, we VACATE the district court's holding that he established a violation of the unlawfulness prong of California's UCL based on his RICO claim.

Conclusion

The district court erred in determining that Rezner had satisfied the causation requirement of his RICO claim. Therefore, we AFFIRM the denial of summary judgment on the PSLRA issue, REVERSE the grant of summary judgment on the RICO claim, and VACATE the grant of summary judgment on the UCL claim. We REMAND for further proceedings.

**AFFIRMED** in part; **REVERSED** in part; **VACATED** in part; and **REMANDED** for further proceedings.[4]

---

[4]Each party shall bear its own costs.