RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0339p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

STEPHEN OUWINGA; LEANN OUWINGA;
DAVID OUWINGA; CHRISTINE OUWINGA;
STONEY CREEK FISHERIES AND EQUIPMENT
INC., on behalf of themselves and all others
similarly situated,

          *Plaintiffs-Appellants*,

     *v.*

BENISTAR 419 PLAN SERVICES, INC.;
BENISTAR LTD.,

          *Defendants*,

JOHN HANCOCK VARIABLE LIFE INSURANCE
COMPANY; JOHN HANCOCK LIFE INSURANCE
COMPANY; EDWARDS ANGELL PALMER &
DODGE, LLP; JOHN H. REID, III; KRIS
LESLEY; ROBERT FOGG; PASCIAK JOHN
HANCOCK AGENCY LLC, fka West Michigan
Pasciak General Agency,

          *Defendants-Appellees*.

No. 10-2531

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:09-cv-60—Janet T. Neff, District Judge.

Argued: April 11, 2012

Decided and Filed: September 19, 2012

Before: SUHRHEINRICH, STRANCH, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** W. Ralph Canada, Jr., CANADA RIDLEY, LLP, Grapevine, Texas, for
Appellants. Eric S. Mattson, SIDLEY AUSTIN LLP, Chicago, Illinois, John R.
Oostema, SMITH HAUGHEY RICE & ROEGGE, Grand Rapids, Michigan, David M.
Saperstein, MADDIN, HAUSER, WARTELL, ROTH & HELLER, P.C., Southfield,

1

Michigan, for Appellees.  **ON BRIEF:** W. Ralph Canada, Jr., K. Adam Rothey, CANADA RIDLEY, LLP, Grapevine, Texas, Frederick D. Dilley, RHOADES McKEE, PC, Grand Rapids, Michigan, David R. Deary, Jeven R. Sloan, LOEWINSOHN FLEGLE DEARY, LLP, Dallas, Texas, Joe R. Whatley, Jr., WHATLEY DRAKE & KALLAS, LLC, New York, New York, for Appellants.  Eric S. Mattson, Joel S. Feldman, Jason M. Adler, SIDLEY AUSTIN LLP, Chicago, Illinois, Melissa C. Brown, DYKEMA GOSSETT PLLC, Grand Rapids, Michigan, John R. Oostema, Calvin J. Sterk, SMITH HAUGHEY RICE & ROEGGE, Grand Rapids, Michigan, Kathleen H. Klaus, MADDIN, HAUSER, WARTELL, ROTH & HELLER, P.C., Southfield, Michigan, for Appellees.

––––––––––––––––

OPINION

––––––––––––––––

JANE B. STRANCH, Circuit Judge.  Plaintiff-Appellants Stephen, Leann, David, and Christine Ouwinga and their company, Stoney Creek Fisheries and Equipment, Inc., (the "Ouwingas") appeal the dismissal of their Complaint against various Defendant-Appellees related to a purported tax-deductible welfare benefit plan—the Benistar 419 Plan ("Benistar Plan" or "Plan")—marketed and sold by the Appellees to the Ouwingas. The Internal Revenue Service determined that the Plan was an abusive tax shelter, and the Ouwingas were ultimately assessed back taxes, interest, and penalties.  They filed this class action on behalf of themselves and all others similarly situated, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") as well as several state law claims.  For the following reasons, we REVERSE the district court's dismissal of the Amended Complaint and remand for further proceedings.

## I.  BACKGROUND

### A.    Factual Background

Because this appeal arises from a decision at the motion to dismiss stage, we draw the facts from the allegations of the Amended Complaint.  Plaintiffs Stephen, Leann, David, and Christine Ouwinga own Plaintiff Stoney Creek Fisheries and Equipment, Inc., a company based in Newaygo County, Michigan.  In September 2001, the Ouwingas were approached by Defendant Kris Lesley (a former high school

classmate of David Ouwinga) about financial products offered by Defendant John Hancock. The Ouwingas attended a meeting with Lesley and his supervisor, Defendant Robert Fogg, at which both highlighted the "incredible tax liabilities" of the Ouwingas and offered to research potential tax-liability-reduction options.

The Ouwingas met again with Lesley and Fogg who presented the Benistar 419 Plan and explained the purported tax benefits of the Plan, asserting that Plan contributions were tax-deductible and that the Ouwingas could take money out of the Plan at any time tax-free. On October 18, the Ouwingas, their accountant, and their attorney met with Lesley and Fogg, who gave a detailed presentation regarding the structure and purported tax benefits of the Plan. A tax attorney for the John Hancock entities participated telephonically, providing legal assurances to the Ouwingas and affirming the representations about the Plan's tax benefits.

Lesley and Fogg then forwarded several documents to the Ouwingas including John Hancock's legal authority regarding welfare benefit trusts. They presented the Benistar 419 Plan and Trust in the form of two large loose-leaf binders produced by the Benistar Admin Services, Inc. ("the Benistar Books"). These Books contained information about the Plan in general; touted its purported advantages, tax and otherwise; and provided a legal opinion from Defendants Edwards Angell Palmer & Dodge LLP ("Edwards Angell") and John Reid. The Ouwingas allege that the John Hancock entities adopted and advanced the representations made in these Books. Defendant John Hancock Life Insurance Company inserted certain disclaimers into these Books, asserting the Insurance Company made no representations about the tax benefits of the Benistar Plan. The Benistar Books also contained copies of Internal Revenue Code ("IRC") sections 419 and 419a and copies of certain federal court rulings. The Ouwingas allege the Defendants used the Benistar Books to highlight only positive authority and ignored certain IRS Notices and Rulings that "would have given the Plaintiffs an (accurate) indication that Plan Payments were not deductible."

Based on the representations of Lesley and Fogg and the legal opinion of Edwards Angell, the Ouwingas agreed to participate in the Benistar Plan in late 2001 and

each Plaintiff made substantial contributions. These contributions were used by the Plan to pay premiums to the John Hancock entities to purchase large insurance policies on the lives of the Ouwingas.

On September 25, 2002, Lesley sent the Ouwingas a series of bulletins that he claimed were "very encouraging for the continued existence of these plans," showed that "Benistar remains to be the leading authority on these plans," and "also [gave] John Hancock very high praise." Several written statements and representations in these bulletins assured that new tax shelter reporting rules would not affect participants in the Benistar Plan and expressly represented that the Plan was not considered a tax shelter under IRS guidelines.

In 2003, Lesley and Fogg told the Ouwingas that the IRS had changed the rules; that the Ouwingas would need to contribute additional money so the Plan could purchase new life insurance policies to keep the Plan compliant; and that each year they would need to form a new plan. Lesley and Fogg assured the Ouwingas that, while this might signal that the "loophole" in the Code might be closing soon, there was no reason to be concerned about the tax benefits that had already been claimed in prior years or the benefits that were going to be claimed in 2003. Reid of Edwards Angell also issued letters dated October 24, 2003; November 4, 2003; and December 19, 2003 assuring that under the "new IRS rules" the Benistar plan was still not a tax shelter and was viable against any challenge by the IRS. In response to an inquiry by an advisor of the Ouwingas, Lesley and Fogg sent a letter dated November 20, 2003 further representing that the Plan was in compliance with the latest IRS rules.

In 2006, the Ouwingas decided to terminate and/or transfer policies out of the Benistar Plans. The John Hancock entities again advised the Ouwingas that there would be no taxable consequences of this transaction and that the Benistar Plan continued to meet the IRS requirements for tax deductible treatment. They also assured the Ouwingas that there "had [been] no audits or problems with clients who did buy outs." At that time, the Ouwingas were asked to and did sign a "Plan Termination and Policy Release Form" for each transaction, which contained a purported liability release of Benistar 419

Plan & Trust, Benistar Admin. Services, Inc., and Benistar 419 Plan Services from "any and all claims."

By letter dated January 23, 2007, the IRS notified the Ouwingas that their tax returns for the years 2003 and 2004 were going to be examined. In early 2008, the IRS notified the Ouwingas that it was disallowing deductions related to the Benistar Plan. The IRS ultimately assessed back taxes, interest, and penalties as a result of the tax benefits the Ouwingas claimed from the Benistar Plan, which the IRS deemed to be an "abusive tax shelter."

**B.      Procedural Background**

On January 22, 2009, the Ouwingas filed a class action Complaint against Benistar 419 Plan Services, Inc. and Benistar Ltd. (the "Benistar Defendants"); John Hancock Variable Insurance Company and John Hancock Insurance Company (the "Hancock Defendants"); Edwards Angell Palmer & Dodge LLP and John Reid (the "Lawyer Defendants"); and Kris Lesley, Robert Fogg, and Pasciak John Hancock Agency LLC f/k/a West Michigan Pasciak General Agency (the "Agent Defendants"). Shortly thereafter, the Ouwingas voluntarily dismissed the Benistar Defendants and amended their Complaint. The Amended Complaint alleges that the Defendants conspired to defraud employers such as the Ouwingas into adopting welfare benefits plans supposedly in compliance with IRC § 419A(f)(6), which allows significant tax benefits. Specifically, the Ouwingas assert violations of RICO, 18 U.S.C. §§ 1962(c), (d), and negligent misrepresentation against all Defendants; and additional claims of fraudulent misrepresentation/omission, unjust enrichment, breach of fiduciary duty, breach of contract, and violations of state consumer protection laws against the Hancock Defendants.

The Defendants filed motions to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). The Defendants asserted the Ouwingas' RICO claims were barred by the Private Securities Litigation Reform Act ("PSLRA") and that the allegations of "enterprise," "conduct," "racketeering," and "conspiracy" in the Amended

Complaint were each defective. The Defendants primarily relied on the disclaimers present in the Benistar Books to defeat the remaining state law claims.

On October 29, 2010, the district court entered an order granting each motion to dismiss and dismissing the Ouwingas' Amended Complaint in its entirety. Although the district court did not find the Ouwingas' RICO claims barred by the PSLRA, the court found the Ouwingas failed to sufficiently plead the "conduct" and "enterprise" elements for a valid RICO claim. The court dismissed all state law claims because the Ouwingas signed "explicit disclaimers and disclosures that appear in multiple documents." On appeal, the Ouwingas challenge the district court's dismissal of all their claims.

## II. DISCUSSION

### A. Standard of Review

We review the district court's order granting a Rule 12(b)(6) motion to dismiss de novo. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008). In assessing a complaint for failure to state a claim, we must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

### B. The PSLRA

In the Private Securities Litigation Reform Act, Pub. L. No. 104-67, 109 Stat. 737 (1995), Congress amended RICO to exclude "any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The purpose behind this amendment was to avoid duplicative recovery for fraud actionable under the securities laws: "Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both necessary [sic] and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO." 141 Cong. Rec. H13, 691-08, at H13, 704 (daily ed. Nov. 28, 1995) (statement of SEC Chairman Arthur

Levitt).  The amendment not only eliminates securities fraud as a predicate act in civil RICO claims, but also prevents plaintiffs from relying on other predicate acts if they are based on conduct that would have been actionable as securities fraud.  *See Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1991).  The Ouwingas' RICO claims are based on the purchases of variable life insurance policies which, because they are "variable," qualify as securities.  The district court held that the PSLRA does not bar the claims of the Ouwingas because the "securities transactions"—the sale of the policies—were not integral to or "in connection with" the fraudulent scheme as a whole.

The Defendants assert that even though the Ouwingas did not allege securities fraud, their complaint could present a claim for violation of securities laws and is thus barred by the PSLRA.  The Defendants, however, fail to provide any specific reference to a securities action available based on the Amended Complaint's allegations.  Instead, the Defendants support their argument that fraud in the sale of the Benistar Plan was "in connection with" the purchase of securities by citing cases primarily involving fraud that directly coincided with the securities transaction.  *See, e.g.*, *SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("[R]espondent's fraud coincided with the sales themselves."); *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007) (finding that "[t]he entire purpose" of the scheme was to allow the transfer of stock so that the plaintiff's basis in those assets would be artificially inflated).

The Ouwingas respond that they do not allege fraud relating to the purchase of the variable life insurance policies by the Plan.  They note that their fraud claim relates only to the tax consequences of the Benistar Plan, and it is merely incidental that the policies happened to be securities.  The Southern District of New York articulated the distinction well:

> Plaintiffs do not allege a securities fraud, but rather a tax fraud. There was nothing per se fraudulent from a securities standpoint about the financial mechanism and schemes used to generate the tax losses. While the alleged fraud could not have occurred without the sale of securities at the inflated basis (which created the artificial loss to offset Plaintiffs' major capital gains), it is inaccurate to suggest that the actual purchase

and sale of securities were fraudulent.  In actuality, the securities performed exactly as planned and marketed; it was the overall scheme that allegedly defrauded the Plaintiffs and Class Members. . . . This Court as well finds that the alleged fraud here involved a tax scheme, with the securities transactions only incidental to any underlying fraud. Accordingly this Court will not apply the PSLRA bar to Plaintiffs' RICO claims.

*Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 458 n.9 (S.D.N.Y. 2009).  The Ninth Circuit relied on similar reasoning when it found a tax-shelter RICO claim was not barred by the PSLRA, holding that it was "not sufficient merely to allege a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." *Rezner v. Bayerische Hypo-Und Vereinsband AG*, 630 F.3d 866, 871-72 (9th Cir. 2010) (citation and alteration omitted).

The analysis in the cases cited by the Ouwingas, including *Kottler* and *Rezner*, applied to the factual allegations in this case support the finding that the securities transactions here were not integral to or "in connection with" the fraudulent scheme as a whole.  The district court correctly found that the PSLRA did not bar the Ouwingas' RICO claims because the fraud and the securities transactions were essentially independent events.

**C.     RICO Violation under § 1962(c)**

The Ouwingas challenge the dismissal of their substantive RICO claim under 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To state a RICO claim, a plaintiff must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).  The Ouwingas challenge the district court's finding that

they did not sufficiently plead the first two elements.  The district court made no finding as to whether the Ouwingas properly pled a "pattern of racketeering activity."  We address each element.

       *1.    "Conduct"*

A plaintiff must set forth allegations to establish that the defendant conducted or participated, "directly or indirectly, in the conduct of [the RICO] enterprise's affairs." 18 U.S.C. § 1962(c).  In *Reves v. Ernst & Young*, the Supreme Court held that participation in the conduct of an enterprise's affairs requires proof that the defendant participated in the "operation or management" of the enterprise.  507 U.S. 170, 183 (1993).  RICO liability is not limited to those with primary responsibility for the enterprise's affairs; only "some part" in directing the enterprise's affairs is required.  *Id.* at 179.  However, defendants must have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  *Id.* at 185 (emphasis in original). Concluding that the Agents sold "pre-packaged" Plans and the Lawyers merely rendered traditional legal services, the district court held the Ouwingas failed to allege that the Defendants participated in any affairs beyond the operation of their own businesses.

We disagree.  The Amended Complaint alleges participation by the Defendants in the enterprise  sufficiently to satisfy the "operation or management" test.  We have held:

> Although *Reves* does not explain what it means to have some part in directing the *enterprise's* affairs, subsequent decisions from our sister circuits have persuasively explained that it can be accomplished either by making decisions on behalf of the enterprise *or by knowingly carrying them out*.

*United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008) (emphasis added).  Even if the Benistar Plan was designed by the Benistar entities, the Agent and Lawyer Defendants carried out the directions of the Benistar entities by marketing the Plan directly to investors and providing allegedly incomplete and misleading legal opinions. Importantly, the Ouwingas allege the Defendants carried out these directions, all the

while knowing that contributions to the Plan were not likely to be allowed as deductions by the IRS. The district court held these allegations to be merely conclusory. The Amended Complaint reveals otherwise—it lists the specific IRS rulings and notices that should have put the Defendants on notice of the likelihood that the Benistar Plan was not compliant with IRC § 419A(f)(6), but which were allegedly ignored in favor of older rulings and notices that were more favorable. Assuming the truth of these allegations, as a court must for a 12(b)(6) motion, it is plausible that the Defendants were aware of the falsity of the tax benefits that they represented as flowing from the Benistar Plans and that they promoted to the Ouwingas.

The Defendants rely on *Stone v. Kirk*, 8 F.3d 1079 (6th Cir. 1993), to argue that the marketing of a fraudulent plan is not sufficient participation to satisfy the "operation or management" test. In *Stone*, the defendant was a sales representative for Sagittarius Recording Company, which used fraudulent appraisals and other misrepresentations to lure investors into a master-recording leasing program. *Id.* at 1082. In fact, Sagittarius was so convincing about the tax benefits of the leasing program that the agent defendant invested some of his own money in the program. *Id.* With little explanation, *Stone* held that the agent defendant did not participate in the operation or management of the RICO entity, which was defined to be Sagittarius and its associates. *Id.* at 1092.

The Agent Defendants here argue that they, like the defendant in *Stone*, were merely sales agents and did not participate in the operation or management of the alleged RICO enterprise. However, the Amended Complaint alleges: that the Agent Defendants were more than a mere conduit of information supplied by Benistar; that all the Defendants were aware of the IRS notices, which put the Plan's legality into question; and that, notwithstanding, the Agent Defendants continued to represent the tax benefits of the Benistar Plan over several years. *Fowler* makes clear that knowingly carrying out the orders of the enterprise satisfies the "operation or management" test. 535 F.3d at 418.

Though the Lawyer Defendants provided opinion letters to a client, Benistar, relating the tax consequences of the Benistar Plan, the Ouwingas allege that they knew

the purpose of the Benistar Plan was to falsely represent tax benefits, knew of IRS warnings that these type of plans would not qualify for deductions, and created their opinions letters for the purpose of falsely promoting the plan as a tax-saving device to potential investors. In *Davis v. Mutual Life Insurance Co. of New York*, we relied on the knowledge and continued endorsement of a fraudulent scheme by an insurance company, MONY, to find the "conduct" element satisfied:

> [E]ven after MONY had received numerous warnings concerning [the agent's] fraudulent sales tactics, MONY continued to allow, if not actively encourage, [the agent] and his associates to carry on with their scheme. In light of this state of affairs, and of the central role that MONY's life insurance policies played in [the] scheme, we have little difficulty in ruling that MONY exercised sufficient control over the affairs of the RICO enterprise to withstand scrutiny under *Reves*.

6 F.3d 367, 380 (6th Cir. 1993). Because the Ouwingas alleged the continued promotion of the Benistar Plan by all the Defendants in the face of this information, the Amended Complaint plausibly alleges that the Defendants participated in the *enterprise's* affairs and not merely their own.

We recognize that although this analysis applies to all Defendants, the various Defendants acted in different capacities and those differences may ultimately impact the determination of whether a particular Defendant only participated in his own affairs. But that is a matter to be fleshed out in discovery and to be resolved through motion practice or by the jury. At this stage in the litigation, the Ouwingas have alleged sufficient facts to satisfy *Reves*'s "operation or management" test, as interpreted in this circuit by *Fowler*, and the district court erred in finding otherwise.

### 2.     *"Enterprise"*

RICO defines an "enterprise" as "any individual, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Ouwingas allege that the Defendants created an association-in-fact enterprise. In order to establish the existence of an "enterprise" under § 1962(c), a plaintiff is required to prove: (1) an ongoing organization with some

sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged. *United States v. Chance*, 306 F.3d 356, 372 (6th Cir. 2002) (citing *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993)). The district court found that the Ouwingas failed to satisfy the third element because they did not make allegations sufficient to show that the enterprise existed for a purpose separate and distinct from the pattern of racketeering.

The Supreme Court recently clarified what is required to show an association-in-fact enterprise in *Boyle v. United States*, 556 U.S. 938 (2009). The Court stated that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. An association-in-fact enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach." *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). The Supreme Court clarified that this organizational structure need not be hierarchical, can make decisions on an ad hoc basis, and does not require the members to have fixed roles. *Boyle*, 556 U.S. at 948. Put another way, a plaintiff must show "simply a continuing unit that functions with a common purpose." *Id.*; *see also id.* at 949 (emphasizing "the breadth of the 'enterprise' concept").

Though the district court recognized both the importance of the wide reach of RICO to stymie corruption and the refusal of *Boyle* to narrowly interpret the statute, it determined that the Ouwingas did not allege a structure *distinct* from the pattern of racketeering. It warned that if allegations of mirror-image, ill-motivated activity of normal business conduct are sufficient to establish an enterprise, all business conduct gone awry would constitute a per se RICO enterprise. This concern is not well founded and ignores the statutory requirement of liberal construction to effectuate RICO's

remedial purposes. Moreover, our decision in *Hofstetter v. Fletcher*, 905 F.2d 897 (6th Cir. 1988), directly addresses the issue:

> "RICO applies both to legitimate enterprises conducted through racketeering operations as well as illegitimate enterprises." *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985) (citing *United States v. Turkette*, 452 U.S. 576 (1981)). In *Qaoud*, we held that although "enterprise" and "pattern of racketeering activity" are separate elements, they may be proved by the same evidence.

905 F.2d at 903 (finding an association-in-fact enterprise consisting of a group of insurance agents who joined together to sell insurance policies by emphasizing false tax advantages). This understanding is consistent with *Boyle*, where the Supreme Court recognized that although the existence of an enterprise is a separate element that must be proved, the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce." 556 U.S. at 947 (quoting *Turkette*, 452 U.S. at 583). In *Boyle*, the Court upheld an instruction that allowed a jury to find an association-in-fact enterprise "form[ed] solely for the purpose of carrying out a pattern of racketeering acts" and instructed that "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id.* at 942 n.1. "[A] pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact [enterprise]." *Id.* at 951.

The Amended Complaint alleges an organizational structure that satisfies the standard in *Boyle*. It delineates the specific roles and relationships of the Defendants, alleges the enterprise functioned at least five years, and alleges it functioned for the common purpose of promoting a fraudulent welfare benefit plan to generate commissions and related fees. That pattern of activity is sufficient to permit a jury to infer the existence of an enterprise. *See Hofstetter*, 905 F.2d at 903.[1]

---

[1] As an alternative argument, the Hancock Defendants argue that only "individuals" and not corporations or entities can form an association-in-fact enterprise. They rely on the language of § 1961(4), which they argue describes either "any individual, corporation, association, or other legal entity," on the one hand, or "any union or group of *individuals* associated in fact although not a legal entity," on the other hand. Such a limited reading of § 1961(4), however, is directly contrary to clear Sixth Circuit precedent. *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 887 (6th Cir. 1990) (recognizing

### 3.        *"Pattern of Racketeering"*

To establish a substantive RICO violation, a plaintiff must show "a pattern of racketeering activity." 18 U.S.C. § 1962(c). A pattern of racketeering activity requires, at a minimum, two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5) (emphasis in original). The Supreme Court has held, however, that the minimum two acts are not necessarily sufficient and that a plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989) (emphasis in original). This requirement is known as the "relationship plus continuity" test. *See Brown v. Cassens Transp. Co.*, 546 F.3d 347, 355 (6th Cir. 2008).

The relationship prong is satisfied by showing the predicate acts have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240. A particular defendant's predicate acts are not required to be interrelated with each other; instead, the predicate acts must be connected to the affairs and operations of the criminal enterprise. *Fowler*, 535 F.3d at 421. The Ouwingas allege as predicate acts mail and wire fraud based on the various communications from the Defendants, which fraudulently misrepresented the tax consequences of the Benistar Plan. All predicate acts allegedly had the same purpose of misrepresenting the Plan's tax consequences, were directed toward the Ouwingas, and were presented to the Ouwingas through the same participants, the Agent Defendants, purportedly as continued assurances about the Plan's benefits. The relationship prong is satisfied here.

The continuity prong of the test is satisfied by demonstrating either "a 'close-ended' pattern (a series of related predicate acts extending over a substantial period of time) or an 'open-ended' pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed)." *Heinrich v. Waiting Angels Adoption Servs.*, 668 F.3d 393, 409-10 (6th

---

that a group of corporations can form an enterprise). As the Defendants correctly recognize, their argument is foreclosed by *Dana Corp.*

Cir. 2012) (citing *H.J. Inc.*, 492 U.S. at 241-42). In other words, the continuity prong "is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc.*, 492 U.S. at 242-43. This prong is clearly met for the Agent and Hancock Defendants who communicated consistently with the Ouwingas for at least five years.

The analysis is closer for the Lawyer Defendants. The Lawyer Defendants issued four opinion letters, the first dated in 1998 and the other three sent over the span of two months in 2003. The similarity in the representations of tax consequences in all letters can plausibly indicate that the Lawyer Defendants participated in the fraudulent enterprise over that entire period. The allegations against the Lawyer Defendants in the Amended Complaint are sufficient to withstand a motion to dismiss.

**D.     RICO Conspiracy under § 1962(d)**

The district court dismissed the Ouwingas' RICO conspiracy claim under § 1962(d) "for the same reason" it dismissed their § 1962(c) claim and because it found the allegations regarding a conspiracy to be merely conclusory. Although the Amended Complaint's allegations in the conspiracy section appear to be conclusory, the Amended Complaint expressly incorporates all prior allegations therein. It is a plausible inference from the incorporated factual allegations that the Defendants agreed and conspired to commit the predicate acts in furtherance of the fraudulent scheme. Therefore, the Amended Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because the allegations are not merely conclusory, and because the Ouwingas have pled a claim under § 1962(c), the district court erred in dismissing the Ouwingas' RICO conspiracy claim under § 1962(d).

**E.     State Law Claims**

The Ouwingas allege six claims under state law: one claim of negligent misrepresentation against all Defendants and five claims against the Hancock

Defendants, including fraudulent misrepresentation/omission, unjust enrichment, breach of fiduciary duty, breach of contract, and violation of state consumer protection laws. The district court found all state claims against the Hancock Defendants were foreclosed by "the explicit disclaimers and disclosures that appear in multiple documents signed by plaintiffs." The court dismissed the negligent misrepresentation claim against all Defendants because it determined the Ouwingas could not prove justifiable reliance in the face of those same disclaimers. The district court further noted that the Lawyer Defendants could not be liable for fraudulent misrepresentation because they issued opinions only, which are not actionable as misrepresentations.

The Ouwingas argue the district court's reliance on the disclaimers was inappropriate because they were presented and considered out of the context of the volume of documents in which they were contained. It is undisputed that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997). The Defendants attached to their motions to dismiss copies of the disclaimer forms provided to the Ouwingas, most of which had been included in the Benistar Books. The Ouwingas expressly challenge the scope, validity, and enforceability of the disclaimers based on the context in which the disclaimers were presented to them. The Ouwingas argue that the disclaimers were interspersed in the Benistar Books amidst a mountain of documents containing repeated representations about the tax benefits of the Benistar Plan, the very representations that the disclaimers submit were not being made or relied upon.

"While documents integral to the complaint may be relied upon, even if they are not attached or incorporated by reference, it must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (citations, internal quotation marks, and alterations omitted). This principle is equally applicable where issues of fact regarding the validity and enforceability of the disclaimers exist. *See Knowlton v. Shaw*, 708 F. Supp. 2d 69, 75 (D. Me. 2010) ("[I]f the parties do not

dispute a central document, a court may consider it in ruling on a motion to dismiss; yet, if there is a genuine dispute, the legal sufficiency of the cause of action is better tested in a motion for summary judgment."). Thus, the district court erred in relying on a document whose validity was in question.

The district court also found that the fraudulent misrepresentation claim against the Lawyer Defendants should be dismissed because the opinion letters stated they were not to be relied on by anyone else besides Benistar and because opinions could not form the basis for misrepresentations. As with the disclaimers in the Benistar Books, the Ouwingas challenge the validity of disclaimers in the letters, and also emphasize that the 1998 opinion letter—the only letter the Ouwingas possessed when deciding whether to participate in the Benistar Plan—did not contain any reliance disclaimer.

The district court noted that mere opinions are generally not actionable as misrepresentations, but did not explain why the opinion letters should fit into this general rule at the motion to dismiss stage, where all inferences are to be drawn in the Ouwingas' favor. The district court relied on *City National Bank of Detroit v. Rodgers & Morgenstein*, 399 N.W.2d 505 (Mich. Ct. App. 1986), for this proposition, but that court distinguished its facts "from the situation in which an ordinary person deals in reliance upon an attorney's opinion on a point of law." *Id.* at 508. The Ouwingas allege the purpose of the opinion letters was to add a legal stamp of approval to the fraudulent tax plan and to give potential clients the peace of mind to participate in the Plan. Thus, they allege the Lawyer Defendants were giving legal tax advice not only to Benistar, its direct client, but also to the intended recipients, taxpayers evaluating the Plan. The Supreme Court has recognized that "[w]hen an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." *United States v. Boyle*, 469 U.S. 241, 250 (1985). Therefore, it is plausible that the Ouwingas could show reliance on the opinion letters.

The district court erred in considering the disclaimers at the 12(b)(6) stage when their validity was directly in question based on the full context of their presentation to

the Ouwingas. Because this formed the basis for the district court's analysis of the state law claims, we must reverse dismissal of those claims.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court judgment dismissing the Ouwingas' Amended Complaint is reversed and the matter is remand for further proceedings consistent with this opinion.