RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0290p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER ODUM (15-2280); WILLIAM FRAZIER (15-2503),

*Defendants-Appellants.*

Nos. 15-2280/2503

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cr-20764-5—Paul D. Borman, District Judge.

Argued: October 4, 2017

Decided and Filed: November 30, 2017[*]

Before: GIBBONS, COOK, and THAPAR, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Karen J. Davis Roberts, Saline, Michigan, for Appellant in 15-228. Stephen J. van Stempvoort, MILLER JOHNSON, Grand Rapids, Michigan, for Appellant in 15-2503. Mark J. Chasteen, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Karen J. Davis Roberts, Saline, Michigan, for Appellant in 15-228. Stephen J. van Stempvoort, MILLER JOHNSON, Grand Rapids, Michigan, for Appellant in 15-2503. Mark J. Chasteen, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

———————

[*]This decision was originally filed as an unpublished opinion on November 30, 2017. The court has now designated the opinion for publication.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  This appeal arises from the convictions of two members of the Phantom Motorcycle Club ("PMC"), William Frazier and Christopher Odum. The government brought various charges against these two appellants and twelve others[1] in a fifteen-count indictment.  Although the case initially proceeded as a consolidated trial against all defendants, Frazier and Odum were severed, and the case against them proceeded separately. After a three-week trial, the jury convicted Frazier of two counts of assault with a dangerous weapon in aid of racketeering, 18 U.S.C. § 1959(a)(3) (VICAR), and one count of use and carry of a firearm during, and in relation to, a crime of violence, 18 U.S.C. § 924(c).  Odum was convicted of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5) (VICAR).

Frazier and Odum raise numerous challenges to their convictions on appeal.  Specifically, they assert several claims of insufficient evidence to sustain their convictions as well as claims of improper venue, the improper admission of hearsay statements, and due process violations for failure to call a witness or provide certain evidence to the defense.  For the reasons addressed below, we affirm the convictions.

I.

PMC is an "outlaw" motorcycle club that has existed since 1968.  The club has chapters in Michigan, Ohio, and six other states, and Detroit is the "mother" chapter.  PMC has a hierarchical structure, with a national president, vice president, and enforcers.  Below the national officers are local chapters with presidents and vice presidents.  Members wear leather vests, known as "rags," which are important symbols in motorcycle club culture.  Rags display a certain member's club and that club's territory, and PMC competes with rival outlaw clubs to be the dominant club within certain territories.

---

[1]Six of the other defendants charged in this indictment are also before us on appeal.  Though initially consolidated for oral argument, we granted Frazier's and Odum's motion to separate cases for oral argument on appeal.

Frazier became the vice president of the Pontiac chapter of PMC in 2010 after transferring from another PMC chapter. Frazier's charges and convictions in this case relate to a shooting that took place during a PMC anniversary gathering in Columbus, Ohio, in October 2012. After arriving in Columbus for the event, Frazier met up with other Phantoms—Vincente Phillips and Maurice Williams—at the PMC clubhouse there. These three men, while wearing their rags, went to get food at another club's clubhouse. While there, a man wearing a third club's rags bumped into Williams, and Williams and Phillips began fighting with him and another man who attempted to intervene. Seeing this altercation, Frazier fired two shots, hitting Keith Foster and Shalamar Thompson, who were both members of the Zulus motorcycle club. The PMC members then fled the scene and immediately returned to the PMC clubhouse to report to PMC leaders what happened. It was later determined that Foster was the Zulus's national president. As a result, PMC leadership decided that the Pontiac chapter would have to pay for the PMC national president, Antonio Johnson, to travel to Cleveland to meet with the Zulus in order to prevent retaliation for the shooting. At trial, Williams, Phillips, and Phantom-turned government informant Carl Miller all testified to this incident.

Odum joined PMC's Detroit chapter in 2011, and his charges stem from his involvement in the later PMC conspiracy to murder members of a rival motorcycle club, the Hell Lovers. After PMC member Steven Caldwell was murdered in September 2013, Johnson held a meeting in which he called for retaliation against the Hell Lovers—the suspected culprits. Johnson announced a plan to murder three Hell Lovers, which would cause other Hell Lovers to travel to Michigan for the funerals, at which time PMC would attack and kill a large number of their members. Although Odum did not attend this meeting, he was apprised of the plan. In a recorded conversation with Miller, Odum stated that Johnson had given Odum the green light to kill Hell Lovers. The plan was disrupted when the ATF and FBI executed search warrants on Johnson's and another Phantom member's homes. These searches and the evidence uncovered during them led to the indictment in this case.

II.

Odum and Frazier first argue that there was insufficient evidence to convict them of violent crimes in aid of racketeering under 18 U.S.C. § 1959 ("VICAR").[2] We hold there is sufficient evidence to sustain these convictions.

A district court's refusal to grant a motion to acquit for insufficiency of the evidence is reviewed *de novo*. *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 79 (2016). The standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Lowe*, 795 F.3d 519, 522–23 (6th Cir. 2015) (quoting *United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010)). This standard imposes "a very heavy burden" on the defendants. *United States v. Barnes*, 822 F.3d 914, 919 (6th Cir. 2016) (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)).

18 U.S.C. § 1959(a) prohibits committing or conspiring to commit certain violent crimes, including murder and assault with a dangerous weapon, "for the purpose of gaining entrance to or maintaining or increasing [one's] position in an enterprise engaged in racketeering activity . . . ." 18 U.S.C. § 1959(a). To establish a VICAR violation, therefore, the government must show:

> (1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.

---

[2]Odum also argues that there was insufficient evidence to sustain his conviction for RICO conspiracy under 18 U.S.C. § 1962(d). Odum was not charged with or convicted of RICO conspiracy, so we do not address this argument.

*United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992); *see also United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994). Frazier and Odum argue that the government failed to establish several of these prongs.

A.

Odum first argues that there is insufficient evidence that PMC is an enterprise because the government did not show that the purpose of the club was to commit crimes. Such a purpose, however, is not required.[3] VICAR defines "enterprise" as including "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."[4] 18 U.S.C. § 1959(b)(2). Here, the government alleged an association-in-fact enterprise, which requires only three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

At trial, the government produced evidence that PMC's purpose was to preserve and protect the organization's "power, territory, and reputation through the use of intimidation [and] violence" by introducing testimony outlining the importance to PMC of earning respect as the dominant motorcycle club. They also presented evidence that PMC had the purpose of enhancing its members' money-making activities by showing that Phantoms assisted each other in stealing and trafficking motorcycles. The required relationships were shown by testimony regarding PMC's by-laws, its hierarchical chain of command, and the importance of PMC symbols, primarily members' rags. Finally, in addition to testimony from multiple witnesses who had been members of PMC for several years, the government introduced evidence that PMC

---

[3]Odum also argues that the government failed to prove that PMC was an enterprise because it did not demonstrate that PMC profited from members' racketeering activities. However, a VICAR enterprise—like a RICO enterprise—does not require such a showing. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257 (1994) ("Nowhere in either § 1962(c) or the RICO definitions in § 1961 is there any indication that an economic motive is required.").

[4]This definition is identical to the enterprise definition in RICO, except the interstate commerce requirement in RICO is found in the substantive provision, while in VICAR it is found in the definition of the term "enterprise." 18 U.S.C. § 1962(c); 18 U.S.C. § 1959(b)(2). Therefore, cases assessing the existence of a RICO enterprise also apply to the VICAR enterprise inquiry.

was founded in 1968, satisfying longevity.  Based on all of this evidence, a rational juror could conclude that PMC was an association-in-fact enterprise.

Frazier also argues that the "enterprise" definition was not satisfied because the government did not prove that his assault on the Zulus affected interstate commerce.  The government, however, does not have to prove that his particular assault affected interstate commerce.  To meet the VICAR "affecting interstate commerce" requirement, it is only necessary that the enterprise as a whole engaged in interstate commerce or that its activity affected interstate commerce.  *See United States v. Riddle*, 249 F.3d 529, 538 (6th Cir. 2001) (RICO); *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985) (RICO).  Furthermore, if an enterprise engages in economic activity, then even a *de minimis* connection to interstate commerce is sufficient to meet the interstate prong of VICAR.  *Waucaush v. United States*, 380 F.3d 251, 255–56 (6th Cir. 2004) (holding wholly intrastate, noneconomic activity must have a significant effect on interstate commerce).

There was sufficient evidence introduced at trial to support that PMC is a large, multistate organization involved in interstate commerce.  Phantoms traveled and communicated across state lines for PMC activities, chapters paid money toward a national fund for travel for the national officers, and PMC members transported stolen motorcycles across state lines.  Accordingly, a jury could rationally conclude from this and other evidence that PMC directly engaged in or substantially affected interstate commerce.

B.

Odum and Frazier next argue that their VICAR convictions cannot stand because the government did not prove that PMC was engaged in racketeering.

Odum's argument focuses largely on the government's purported failure to demonstrate a pattern of racketeering activity or to show "continuity."  This argument mischaracterizes the applicable test.  *See* U.S.C. 18 § 1959; 18 U.S.C. § 1961; *see also H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (interpreting a *pattern* of racketeering activity to require a showing of relationship and continuity).  VICAR uses a specific definition for "racketeering activity" that is *separate* from the definition for "pattern of racketeering activity" used in RICO.  *Compare*

18 U.S.C. § 1959(b)(1) (cross-referencing 18 U.S.C. § 1961(1)), *with* 18 U.S.C. § 1961(5). In other words, Odum's argument goes to an inapplicable test and is therefore meritless.

The relevant question, instead, is whether there is sufficient evidence that PMC as an enterprise was engaged in racketeering activity. Frazier argues that there was not, because the evidence at trial showed only that "individual members of the Phantoms had independently engaged in some criminal activity." CA6 R. 36, No. 15-2503, Frazier Br. at 55. This argument is unpersuasive. The government presented evidence that PMC members committed racketeering activity "for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group." *United States v. Feliciano*, 223 F.3d 102, 117 (2d Cir. 2000); *see also Fiel*, 35 F.3d at 1004. The jury heard testimony about PMC members traveling from Michigan to Ohio to intimidate a rival motorcycle club, the Zulus, into permitting PMC to establish a chapter in Cleveland in 2009. The jury heard testimony about armed Phantoms taking rags from leaders of the Omens motorcycle club in 2010, taking the Black Bottoms motorcycle club's rags in 2013, and conspiring to murder members of the Hell Lovers motorcycle club in 2013, among other concerted acts. These actions were all undertaken with instruction and encouragement from PMC leadership and are only explained by reference to the goals of PMC as an enterprise. Thus, there was sufficient evidence that PMC was an enterprise engaged in racketeering activity.

Finally, Frazier argues that a VICAR conviction requires that the government prove the defendant actually knew that the enterprise was engaged in racketeering activity—that is, an explicit knowledge-of-racketeering requirement. No court, however, has ever found such a requirement. *See, e.g.*, *Concepcion*, 983 F.2d at 381; *Fiel*, 35 F.3d at 1003 (listing elements for a VICAR conviction that do not require the individual have knowledge of the racketeering). Frazier bases his argument on *Flores-Figueroa v. United States*, in which the Supreme Court interpreted a "knowing" *mens rea* element in an identity theft statute to apply to all elements of the crime, using basic statutory interpretation. 556 U.S. 646, 650–54 (2009). This argument, however, fails when applied to a VICAR charge.

First, grafting Frazier's knowledge-of-racketeering requirement onto the statute would allow acts contemplated by VICAR to escape prosecution under the statute. For example,

VICAR covers violent acts committed for the "purpose of gaining entrance to . . . an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). Were we to adopt Frazier's position, VICAR might not cover an individual who commits a violent crime as a part of gaining entry to a gang but who does not have specific knowledge of the group's racketeering activities. Second, even if Frazier's argument based on *Flores-Figueroa* were compelling, VICAR is not subject to standard rules of statutory interpretation. Several courts have explicitly applied RICO's "liberal construction" rule to VICAR, as VICAR was enacted for a similar remedial purpose. *See Concepcion*, 983 F.2d at 381 ("Congress intended RICO, which § 1959 complements, to 'be liberally construed to effectuate its remedial purposes.'" (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985))); *United States v. Mapp*, 170 F.3d 328, 336 (2d Cir. 1999) (noting § 1959's purpose to advance the federal government's strong interest in curbing organized crime); *see also, e.g., Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794 (6th Cir. 2012) (noting RICO's liberal construction requirement). We therefore do not adopt this new requirement and instead hold that proof that the enterprise as a whole engaged in racketeering activity is sufficient to satisfy this prong.

C.

Odum next argues that the government did not present sufficient evidence that he committed a crime of violence. Odum's alleged crime of violence for his VICAR charge is conspiracy to commit murder, stemming from his participation in the PMC plot to murder members of the rival motorcycle club, the Hell Lovers.

Odum claims that the government failed to show that he agreed with anyone besides Miller, who at the time was acting as a government informant, to kill Hell Lovers and therefore cannot be guilty of conspiracy. *See United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009) ("[The informant's] status as a government agent prevents the government from proving the existence of a conspiracy solely between [the defendant] and [the informant]."). The government, however, introduced evidence that Odum agreed with other Phantoms—particularly Johnson—to murder Hell Lovers. For example, in a recording introduced at trial, Odum indicated that Johnson had given Odum the "green light" to move forward with the plan and had ordered him to find a specific Hell Lover as a target. Therefore, viewing the evidence in the light

most favorable to the government, a rational juror could find that Odum agreed with someone besides Miller to the Hell Lovers murder plot.

## D.

Lastly, Frazier argues that there was insufficient evidence that he shot the two Zulus in Columbus for the purpose of "maintaining or increasing" his position within PMC.

This Court has explained that "VICAR's 'purpose' element is met if the jury could find that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise." *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014). Frazier argues that this was a "spontaneous fight" and not motivated by his membership in PMC. A rational jury, however, could find that a defendant's violent defense of fellow gang members was undertaken to preserve standing in the gang when the gang "expected its members to retaliate violently when someone disrespected or threatened a fellow member." *United States v. Gills*, No. 15-1613, 2017 WL 3328036, at *3 (6th Cir. Aug. 4, 2017). Here, although the beginning of the fight may have been spontaneous, Frazier stated that he joined the fight because he thought one of the other Phantoms had been knocked down. He leapt into action to support his fellow Phantoms, and, after doing so, he immediately reported his actions to PMC leadership. From this, a rational juror could find that Frazier was motivated by a purpose to maintain or increase his position in PMC.

Accordingly, because a rational juror could find that the government satisfied its burden as to each prong of VICAR for both defendants, we conclude the VICAR convictions are supported by sufficient evidence.

## III.

Frazier also raises several challenges to his conviction under 18 U.S.C. § 924 for use and carry of a firearm during, and in relation to, a crime of violence. This conviction stems from his use of a firearm during the Columbus shooting. None of the arguments raised have merit.

First, Frazier argues that because there was insufficient evidence to support his VICAR conviction, the § 924 predicate crime of violence, his conviction must be reversed. As addressed above, however, there was sufficient evidence to sustain the VICAR conviction.

Frazier next challenges venue in the Eastern District of Michigan. Because he did not raise this issue in the district court, it is waived. *See United States v. Parlier*, 570 F. App'x 509, 513 (6th Cir. 2014); *cf. United States v. Grenoble*, 413 F.3d 569, 573 (6th Cir. 2005). Frazier also argues that § 924 is "not a continuing offense that can rely on the existence of a Michigan-based 'enterprise.'" In *United States v. Rodriguez-Moreno*, however, the Supreme Court rejected the argument that § 924 is a "point-in-time" offense and held that "[w]here venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense." 526 U.S. 275, 281–82 (1999); *see also United States v. Carpenter*, 819 F.3d 880, 891 (6th Cir. 2016), *cert. granted*, 137 S. Ct. 2211 (2017). Here, the underlying crime was assault with a dangerous weapon *in aid of racketeering*, and venue was therefore proper in the Eastern District of Michigan—the center of the PMC enterprise.

Finally, Frazier argues that § 924(c) is unconstitutionally vague as applied to him under *Johnson v. United State*s, 135 S. Ct. 2551 (2015). His reply brief, however, rightly acknowledges that "this Court's precedent—namely, *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016)—currently precludes his argument." CA6 R. 62, No. 15-2503, Frazier Reply at 30. In *Taylor*, this court squarely rejected the argument that *Johnson* invalidated § 924(c)(3)(B) as unconstitutionally vague, and that decision forecloses his argument here. *See Taylor*, 814 F.3d at 376.

## IV.

Frazier next argues that the court incorrectly allowed several hearsay statements to be introduced at trial under a misapplication of the co-conspirator exception, Rule 801(d)(2)(E). Whether the government met its burden in establishing the 801(d)(2)(E) elements is a preliminary question of fact that is reviewed for clear error, while the ultimate decision to admit the statements is reviewed for abuse of discretion. *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005). This court reviews an evidentiary objection not raised at trial for plain error

only. *United States v. Swafford*, 385 F.3d 1026, 1028 (6th Cir. 2004). We hold that the court did not err in admitting these statements.

Although Frazier now challenges admission of over a dozen purportedly hearsay statements, at trial he objected to only two. First, Frazier's counsel objected to government informant Miller's testimony about conversations between Miller, Williams, Phillips, and Frazier at the PMC clubhouse after the Columbus shooting, wherein they admit to the shooting. Second, Frazier's counsel objected to Williams's testimony that the PMC Pontiac chapter was told that it would have to pay for Johnson to travel to Cleveland to meet with the Zulus, because one of the Columbus shooting victims was the Zulus national president. The district judge conditionally admitted these statements under this Court's precedent in *United States v. Vinson*, which allows conditional introduction of purported co-conspirator statements, so long as the required elements under Rule 801(d)(2)(E) are shown by a preponderance of evidence before the conclusion of the government's case in chief. 606 F.2d 149, 153 (6th Cir. 1979). At the close of the government's case, the district court then formally found that the 801(d)(2)(E) standard was met. Referencing *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978), the court stated, "I just want to formalize the *Enright* findings, that the statements made were in furtherance of the conspiracy that dealt with co-conspirator statements and, therefore, are admissible based on my findings of the evidence in the case." DE 717, Trial Tr. Vol. 12, Page ID 9787.

A statement that would otherwise be hearsay may be admitted under Rule 801(d)(2)(E) if the court finds to a preponderance of the evidence that there was a conspiracy involving the declarant and the defendant and that the statement was made in the course of and in furtherance of that conspiracy. Fed. R. Evid. 801(d)(2)(E). Frazier argues that because the government did not demonstrate he was a participant in a RICO conspiracy under 18 U.S.C. § 1962(d), there was no support for the district court's finding that he was involved in a conspiracy under Rule 801(d)(2)(E). However, the government need not prove a full-fledged RICO conspiracy meeting all of the elements of § 1962(d) to satisfy the co-conspirator statement hearsay exception in Rule 801(d)(2)(E). Co-conspirator statements are admissible even when conspiracy has not been

formally charged.**5** *United States v. Blankenship*, 954 F.2d 1224, 1231 (6th Cir. 1992). The question is instead whether the sum of evidence at trial indicated to a preponderance that the statements were made during and in furtherance of any ongoing conspiracy. *See id.* We find that it did.

Frazier was an active member of PMC, and the Columbus shooting was a direct result of Frazier's involvement in PMC's racketeering activity. The first challenged statements, Williams's and Phillips's accounts of the Columbus shooting, were made to PMC leadership for the purposes of determining steps that PMC needed to take to avert retaliation from the Zulus. Similarly, the second challenged testimony—the statements by Phantom members that the person shot in Columbus was the national president of the Zulus—was a part of the ongoing attempt to manage the fallout from the Columbus shooting. A statement "made to apprise a coconspirator of the progress of the conspiracy, to induce his continued participation, or to allay his fears" is made in furtherance of the conspiracy. *Martinez*, 430 F.3d at 327. Therefore, it was not clear error for the district court to conclude that PMC members' reports and discussion of these rivalries were made during and in furtherance of the conspiracy.

Frazier next argues that dozens of recorded of conversations between Miller and other PMC members relating to a shooting in September 2013 and the plot to murder members of the Hell Lovers were inadmissible hearsay. Frazier's counsel, however, affirmatively stated "no objection" to *every single* recording he now challenges when each was introduced at trial. Frazier's attorney also did not object to other statements Frazier now challenges: testimony regarding the origin of the gun Frazier used in the Columbus shooting and Miller's testimony that Johnson told other Phantoms to beat up Hell Lovers in January 2013. As such, we review admission of these statements for plain error only. *Swafford*, 385 F.3d at 1028.

Plain error arises "only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *United States v. Slone*, 833 F.2d 595, 598 (6th Cir.1987) (quotations omitted). This standard requires "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Maliszewski*, 161 F.3d 992, 1003

---

**5**Moreover, Frazier was charged with (and later convicted of) violent crimes *in aid of racketeering*.

(6th Cir. 1998) (quoting *United States v. Dedhia*, 134 F.3d 802, 808 (6th Cir. 1998)). As to the recordings, Frazier did not merely neglect to object to their introduction—he affirmatively consented. Therefore, the court did not commit error in allowing the recordings to be introduced against Frazier. *See United States v. Olano*, 507 U.S. 725, 732–33 (1993) ("Deviation from a legal rule is 'error' *unless the rule has been waived.*" (emphasis added)); *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015) ("First, there must be an error or defect . . . that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived by the appellant." (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009))).

As for the remaining challenged statements, it is enough to say that they did not affect Frazier's substantial rights. To affect substantial rights, the defendant must show that the wrongly admitted evidence would have affected the outcome of the district court proceeding. *See Soto*, 794 F.3d at 655. Here, evidence regarding the origin of the gun used by Frazier was already elsewhere in the record. *See Maliszewski*, 161 F.3d at 1008 (6th Cir. 1998) (finding no plain error when the admitted statement concerned "a minor point and was merely cumulative"). Further, the statement regarding the plot to murder Hell Lovers was not directly related Frazier's charges, and, as noted, there were already dozens of recordings in evidence outlining that PMC plot. The district court did not commit plain error in allowing these statements to be introduced.

V.

Lastly, Frazier claims that he was denied due process because the government chose not to call shooting victim Foster as a witness at trial and failed to turn over a shell casing and spent bullet from the shooting scene. Neither claim has merit.

A.

Frazier first argues that his constitutional due process rights were violated because the government did not call Foster to testify after the government listed him on a witness list. Foster had given previous statements to the police reporting that his attacker was African American. Frazier is Caucasian. The government had originally planned to call Foster, but circulated a final witness list three days before trial without Foster included. Frazier argues that by removing

Foster at the last minute, the government denied him a meaningful opportunity to present a complete defense.

The constitutional guarantee to "a meaningful opportunity to present a complete defense" prevents the government from undertaking certain behavior to exclude or suppress competent, reliable evidence related to defendants' innocence. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). That concern, however, is not implicated here for several reasons. First, the government's decision not to call a witness known to the defense does not constitute evidence suppression. *See United States v. Vasquez*, 672 F. App'x 636, 639 (9th Cir. 2016) ("[W]hen the government opts to disclose a witness list, it is not required to call all witnesses on the list"); *cf. Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). By including Foster on a witness list, the prosecution did not guarantee that they would call him, and their actions did nothing to prevent Frazier from subpoenaing Foster himself. *See United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009). The government was entitled to change its mind about which witnesses to present in its case in chief, and such a decision does not impede a defendant's opportunity to present a complete defense.

Second, Frazier's attorney admitted that he was informed four months before trial that the government did not plan to call Foster. There may have been some continued confusion, as Foster appeared on a later witness list, but any confusion was resolved at least a month before the close of trial when the government re-affirmed its intention not to call Foster in a motion for protective order. Thus, Frazier had not only notice but ample opportunity to subpoena Foster on his own well before trial—but Frazier did not attempt to subpoena Foster until after the trial began.

Finally, during trial, upon discovering that Frazier was attempting to subpoena Foster as a defense witness, the district court actively aided Frazier in the search. When the search failed, the government allowed Frazier's attorney to play an audio recording of Foster's statement shortly after the shooting that identified the shooters as African American. Frazier's attorney told the district court that the government's stipulation to the admission of the recording resolved the issue about Foster's availability. Accordingly, Frazier's constitutional rights were not violated by the government's decision not to call Foster as a witness.

B.

Frazier also argues that his due process rights were violated because the defense did not receive a shell casing and expended bullet recovered from the scene of the Columbus shooting before trial. This due process argument is best characterized as a claim that the government violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). This court reviews *de novo* a *Brady* claim raised in the district court through a motion for mistrial. *United States v. Crayton*, 357 F.3d 560, 568–69 (6th Cir. 2004).

While counsel for Frazier was cross-examining Detective Lovett at trial, Lovett referenced a police report pertaining to the October 2012 shooting as well as a bullet casing and a slug recovered from the scene. These materials had not been produced to the defense before trial, though Lovett's grand jury testimony, which Frazier's counsel received eleven months before trial, did reference this precise evidence. The district court successfully obtained the shell casing and spent slug from Columbus and provided it to the defense during trial. A defense expert examined the guns, and the Michigan State Police laboratory cross-referenced the bullet with the guns seized from other Phantoms during the investigation. After the tests, defense counsel chose not to use the evidence. Frazier included a *Brady* claim related to this evidence in his later motion for judgment of acquittal or new trial, which the district court denied, holding that these claims "were resolved by the Court <u>and</u> the parties during trial." DE 630, Order, Page ID 7574.

To succeed in a *Brady* claim, a defendant must show: (1) that the evidence in question is favorable, (2) that the state purposefully or inadvertently suppressed the relevant evidence, and (3) that the state's actions resulted in prejudice. *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008); *see also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The prejudice prong of this inquiry requires "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).

Frazier's *Brady* claim therefore fails on several counts. First, there is no indication that this evidence was favorable. Though somewhat delayed, Frazier was given the opportunity to

examine the evidence, after which he *chose* not to introduce it at trial. Next, the evidence was not suppressed—it was referenced in the grand jury transcript, which defense counsel reviewed. Finally, there is no indication that earlier access to the evidence would have produced a different verdict. The court took affirmative steps to ensure that Frazier gained access to the evidence. Then, upon receiving and examining the evidence while trial was still ongoing, the defense made the strategic decision not to introduce it. Frazier provides no support for his claim that access to the material before trial could have led to a different outcome. Therefore, Frazier's *Brady* claim is without merit.

## VI.

For the reasons stated, we affirm the district court.